**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No.: 21-CR-593 (ABJ)** |
| **MATTHEW LOGANBILL,** | : | |
| | : | |
| **Defendant** | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT**
**LOGANBILL'S MOTION TO DISMISS COUNTS TWO AND**
**THREE**

Because the arguments contained in Loganbill's Motion to Dismiss Counts Two and Three, ECF No. 46, defy the plain text and history of 18 U.S.C. § 1752, Loganbill's motion should be denied. As the Court and other Judges in this District have held, the Vice President can—and did—"temporarily visit" the U.S. Capitol Building on January 6, 2021, which brings Loganbill's conduct within the plain sweep of Section 1752.

**FACTUAL BACKGROUND**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol building, entered the restricted grounds, and forcibly breached the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress were halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Loganbill, who lives in Versailles, Missouri, drove to Washington, D.C. on January 5, 2021. Loganbill attended the "Stop the Steal" rally on the morning of January 6, 2021.  Loganbill marched with other protestors from the Ellipse to the U.S. Capitol as they chanted "Trump Won!"  As he

approached the Capitol, he observed a line of police officers standing behind barricades.  He observed a group of protestors begin to fight with police and breach the skirmish line.  He observed police officers deploy tear gas cannisters into the crowd and donned his helmet and gas mask.  After the police line collapsed, Loganbill joined other protestors as they ascended the stairs along the west front of the Capitol.

At approximately 2:42 pm, Loganbill entered the U.S. Capitol via the Upper West Terrace doors. He was wearing an olive drab green helmet, gas mask, olive drab crew-neck sweatshirt, beige trousers; he carried a coyote brown backpack, and held an American flag.  Loganbill walked up a flight of stairs, entered the Rotunda and spent approximately 20 minutes in or around the Rotunda.  At approximately 3:10 pm, Loganbill moved into the Rotunda door interior area, and eventually exited the U.S. Capitol via the east front Rotunda doors at approximately 3:15 pm.

Between December 19, 2020 and January 16, 2021, Loganbill posted multiple comments to his Facebook page related to his planning, preparation, and participation in the riot on January 6, 2021:

- December 19, 2020: "They haven't seen a riot, till our side gets started."
- January 4, 2021: "President Trump has been right on just about everything he said … So when he says the election was rigged I'll bet my life on him being right … 74 million strong sir, we got your back."
- January 6, 2021: "Everything was fine all the way to the Capitol, we were near the front, I didn't see any push against the police line until after 8-10 tear gas canisters were fired into the crowd. Then we pushed forward and broke the line into the Capitol. Inside the Capitol was confrontational, but no Patriots hit any police that I was, they sprayed us down several times."
- January 7, 2021: "It's like I told one of the cops that seemed in charge of the police line. You see what we did today 'peacefully' it won't be that way when we return. He said I know, I'm on your side, but my duty is to secure the building and those inside. We shook hands and I walked out of the building."
- January 7, 2021: "The 'widespread destruction' is total BS, there were a few, most likely antifa, that busted some windows, the rest were there to show that 'we' could take what we wanted peacefully. And we did, afterwards we also walked out peacefully. Some cops just a bit belligerent and they got less cooperation, but no punches thrown or fighting of any kind that I saw."
- January 7, 2021: "They saw how easy we took the Capitol – unarmed, and peacefully, next time …"

**<u>ARGUMENT</u>**

Counts Two and Three allege violations of 18 U.S.C. § 1752(a)(1) and § 1752(a)(2), respectively. Section 1752(a)(1) prohibits the unlawful entry or remaining in any restricted building or grounds without lawful authority. Section 1752(a)(2) prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." A "restricted building or grounds," as Loganbill's indictment clearly alleges in Counts Two and Three, is "any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds," where the President or other person protected by the Secret Service, namely, "the Vice President[,] was temporarily visiting." *See United States v. Mitchell,* No. 21-cr-717 (BAH), ECF No. 18; *see also* 18 U.S.C. § 1752(c)(1)(B). At the time Loganbill entered the U.S. Capitol on January 6, 2021, Vice President Mike Pence was present. Loganbill's charged conduct accordingly falls within Section 1752(a)(1) and (a)(2)'s plain sweep because he is alleged to have unlawfully entered a restricted building and engaged in disorderly conduct therein, that was intended to and did disrupt the certification of 2020 Electoral College vote, while the Vice President was "temporarily visiting."

**A.     The Indictment is sufficient as written.**

Contrary to Loganbill's allegations of a "fair notice problem," ECF No. 46 at 13, and that Counts Two and Three fail to allege an offense, *id.* at 17-19, Loganbill's Indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure because it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The Indictment accomplishes this task by "echo[ing] the operative statutory text while also specifying the time and place of the

offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413 n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40 (BAH), 2020 WL 6342940, at *5 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United*

*States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

"[T]he Court has a limited and narrow role in considering a motion to dismiss an indictment." *United States v. Williams*, No. 21-cr-377 (BAH), ECF No. 118 at 79-80. Thus, when ruling on a motion to dismiss for failure to state an offense, a district court may only review the face of the indictment and more specifically, the language used to charge the crimes. *Id.*; *see also United States v. Bingert*, No. 21-cr-91 (RCL), 2022 WL 1659163, at *11 (D.D.C. May 25, 2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, 583 F. Supp. 3d 1, 32-35 (D.D.C. 2022) (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-cr-454 (PLF), 2020 WL 823079 at *4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009)). "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations." *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015), citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

Here, Counts Two and Three are sufficient because they provide the operative statutory text of Section 1752 and specify the time and place of the offenses. *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). Thus, Loganbill has ample notice of "the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *Id.* (quoting *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014)); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).

**B.      The Vice President can "temporarily visit" the U.S. Capitol.**

Loganbill's argument that a Vice President cannot "temporarily visit" the U.S. Capitol

Building—because he or she has an office there—is contrary to Section 1752's plain terms, purpose, and structure. The same argument has been rejected by every Judge in this District to have considered Loganbill's "strained reading of this fairly straightforward phrase."[1] *United States v. Williams,* No. 21-cr-377 (BAH), ECF No. 88 at 5-7. As the Court has explained, "[c]ommon sense easily resolves this debate." *Id.* at 5. Loganbill's "strained interpretation is inconsistent with both the text and the structure of the statute . . . This definition [of 'temporarily visiting'] obviously encompasses Vice President Pence's actions on January 6, 2021. He went to the Capitol with a discrete purpose: to certify the Electoral College votes, a process that by law is contemplated to take one day." *See United States v Williams*, No. 21-cr-168 (ABJ), 2022 WL 2237301, at *19 (D.D.C. June 22, 2022) (citing 3 U.S.C. § 15); *McHugh,* 583 F. Supp. 3d at 33-34 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol")*; see also United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *16 (D.D.C. Mar. 14, 2022) ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only. Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."); *United States v. Puma*, No. 21-cr-454 (PLF), 2022 WL 823079, at *17 (D.D.C. Mar. 19, 2022)

---

[1] *See, e.g., United States v. Williams*, No. 21-cr-377 (BAH), ECF No. 88 at 5-7; *United States v. Griffin*, 549 F. Supp. 3d 49, 52-58 (D.D.C. 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Mostofsky*, No. 21-cr-138 (JEB), 2021 WL 6049891, at *8-*13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Nordean*, No. 21-cr-175 (TJK), 2021 WL 6134595, at *4-*12, *14-*19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1752(a)(1)); 2)); *United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *3-*17 (D.D.C. Mar. 14, 2022) (18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Puma*, No. 21-cr-454 (PLF), 2022 WL 823079, at *4-*19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Bingert*, No. 21-cr-91 (RCL), 2022 WL 1659163, at *3-*11, *12-*15 (D.D.C. May 25, 2022) (18 U.S.C. § 1752(a)(1)).

(stating that under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification.").

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[2] Either definition describes the Secret Service protectee's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family) also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Loganbill criticizes Section 1752's use of the terms "temporarily" and "restricted area," arguing those terms allow the Section 1752's reach to "expand[] and contract[] based on fluid, unidentified factors . . . [and] provides no parameters by which the ordinary person can discern when the Vice President is 'temporarily visiting' the Capitol and, in turn, know when the building is 'restricted' for purposes of § 1752(a)(1)." ECF No. 46 at 13. He also argues that the *McHugh*

---

[2] https://www.merriam-webster.com/dictionary/visit

decision adopting the government's position—that Vice President Pence was "temporarily visiting" the Capitol Building on January 6, 2021—was based on "faulty reasoning" because it "rejected the ordinary person's understanding of what 'temporarily visiting' means when it comes to the Vice President[.]" ECF No. 46 at 12-13.

However, these conclusory arguments ignore the reality of January 6, 2021: Vice President Pence's visit to the U.S. Capitol *was* temporary because he (and his family) traveled there to preside over the Joint Session of Congress—a proceeding of limited duration; at the close of the proceeding, they left, thus confirming the "temporary" nature of their visit. Loganbill was among a small number of rioters who not only breached the Capitol building, but entered the Senate floor, where he leafed through papers and took photographs, thereby delaying the very proceeding the Vice President visited the Capitol to oversee on January 6. *See generally U.S. v. Mitchell,* 21-mj-630 (RMM), ECF No. 1-1.

Loganbill further argues that "the Vice President has a dedicated, permanent office reserved for their use in the Senate" and he therefore cannot temporarily visit his own office. ECF No. 46 at 4, 8-12. But numerous judges have "rejected this exercise in wordsmithing," *Williams*, No. 21-cr-377 (BAH), ECF No. 88 at 5, and for good reason: Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee—not his home or workplace. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Moreover, the United States Capitol is not the Vice President's regular workplace; even if "there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021." *See, e.g., McHugh*, 583 F. Supp. 3d at 33-34 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the

U.S. Capitol); *Williams,* 2022 WL 2237301, at *20 (emphasis in original) ("Defendant insists that the Vice President could not have been 'temporarily *visiting'* the Capitol on January 6th because he regularly *works* there, and because he was in fact working there on January 6th. But defendant's simplistic assertion ignores not only the ordinary meaning of the statutory language, but also the structure of the definition in question . . . The language in 18 U.S.C. § 1752(a)(1) and (2) is plain and unambiguous: the term 'restricted building or grounds' encompasses the United States Capitol, which the Vice President) was 'temporarily visiting' on January 6, 2021.") (citations omitted).

As the Court has explained, "even if the words 'temporarily visiting' were at all ambiguous—a view at odds with a plain reading of the words—the structure of the statute makes clear that defendant's preferred reading would produce absurd results." *Williams*, No. 21-cr-377 (BAH), ECF No. 88 at 6. Such a "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location. It would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia. It would provide more protection for Secret Service protectees in an airplane hangar or a park than in the Capitol Building.

In addition, under Loganbill's construction, Section 1752(c)(1)(B) would not apply where the current President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as here, the Vice President's family visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President herself does. It therefore would afford a higher level of protection for the family of the elected official

than to the elected official herself. No support exists for creating such large and irrational exceptions to the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

Loganbill's position also defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In enacting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. § 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Construing the statutory provisions together, Section 1752(c)(1)(A) and (c)(1)(B) protect the President and Vice President in their official homes and wherever else they go. Interpreting the statute as the defendant suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could endanger the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at every turn," Congress has "*broadened* the scope of the statute and the potential for liability."

*United States v. Griffin,* 549 F. Supp. 3d 49, 56 (D.D.C. 2021) (emphasis in original).

The cases cited by Loganbill—which involve either an arrest or conviction under Section 1752 at a place other than the U.S. Capitol Building—do not discuss the "temporarily visiting" language. *See* ECF No. 47 at 11 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished). But "the fact that those situations clearly qualify does not mean that the relevant situation on January 6 cannot count as well." *Williams*, No. 21-cr-377 (BAH), ECF No. 88 at 6. All the relevant considerations—plain language, statutory structure, and congressional purpose—foreclose Loganbill's crabbed reading of Section 1752(c)(1)(B). Therefore, this Court should reject it.

## C.     The rules of lenity and constitutional avoidance do not apply.

As every other court to address this issue has concluded, the "temporarily visiting" language of Section 1752(a) is unambiguous. Therefore, the Court need not resort to the rules of lenity and constitutional avoidance. As Judge McFadden explained last year when rejecting nearly identical arguments that the rules of lenity and constitutional avoidance should apply as a result of Section 1752's purported ambiguity,

> [Defendant] invokes the doctrine of lenity and the "novel construction principle." Neither applies. Lenity is "a sort of junior version of the vagueness doctrine." It comes into frame only when a court has exhausted all canons of statutory construction and is left with only a coin flip to resolve "grievous ambiguity."
>
> As the Court has explained, Section 1752 is capacious, not ambiguous. [Defendant's] "ability to articulat[e] a narrower construction" of the statute does not trigger lenity. Nor has there been an "unforeseen judicial enlargement" of a longstanding criminal statute so that it operates like an ex post facto law. [Defendant] has allegedly violated a rarely charged statute, but that does not mean the *construction* of the statute unfairly blindsided him. There was no prevailing practice of courts forgoing or rejecting the interpretation that the Government now advances.

*Griffin*, 549 F. Supp. 3d at 57-58 (citations omitted).

The Judges of this District have rejected attempts to cast Section 1752 as "ambiguous." "Section 1752 'is clear[,] gives fair notice of the conduct it punishes, and [does not] invite arbitrary enforcement.'"[3] *United States v. Bozell*, No. 21-CR-216 (JDB), 2022 WL 474144, at *9 (D.D.C. Feb. 16, 2022) (citing *United States v. Nordean*, No. 21-cr-175 (TJK), 2021 WL 6134595, at *19 (D.D.C. Dec. 28, 2021)); *Griffin*, 549 F. Supp. 3d at 57 ("This law is no trap awaiting the unwary.")).

"Likewise, prosecuting [Loganbill] under § 1752 does not unexpectedly broaden the statute." *Id.* "The government alleges that Capitol Police and barricades were present and visible outside the Capitol Building, yet [Loganbill] forced his way in regardless. Those charges, if proven, would clearly constitute violations of § 1752 under the statute's plain text. Hence, the § 1752 charges . . . may proceed to trial." *See id.* (citations omitted).

## CONCLUSION

Loganbill is incorrect when he argues that "the government had other charging choices, and it chose wrongly here."[4] ECF No. 46 at 19. Counts Two and Three, which track the language of 18 U.S.C. § 1752(a)(1) and (2), properly accuse Loganbill of unlawful entry into, and disruptive or disorderly conduct in, a "restricted buildings or grounds," where the Vice President was temporarily visiting. Accordingly, Loganbill's motion should be denied.

---

[3] Loganbill implausibly contends that application of Section 1752(a) to the Capitol Building "creates fair notice problems" that are, apparently, absent when the Vice President travels to a park or airplane hangar.  *See* ECF No. 46 at 13.

[4] In addition to seeking transfer of venue (ECF No. 44), Loganbill has moved to dismiss all but two counts of his Indictment. *See* ECF Nos. 46 (motion to dismiss Counts Two and Three); 45 (motion to dismiss Count One). Other than those two Class B misdemeanors, it is not clear to which "other charging choices" he refers.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Douglas Meisel*
       DOUGLAS MEISEL
       Trial Attorney
       U.S. Department of Justice
       Detailed to the U.S. Attorney's Office
       For the District of Columbia
       601 D Street NW 20001
       (202) 598-2281
       douglas.meisel@usdoj.gov